Daniel B. Chammas, Bar No. 204825
dchammas@fordharrison.com
Jason Shon, Bar No. 306198
jshon@fordharrison.com
**FORD & HARRISON LLP**
350 South Grand Avenue, Suite 2300
Los Angeles, CA  90071
Telephone: (213) 237-2400
Facsimile:  (213) 237-2401

Attorneys for Plaintiff,
TRIGO ADR AMERICAS, LLC

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRIGO ADR AMERICAS, LLC, a Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>OEM LOGISTICS, LLC, a Limited Liability Company, STEVE M. CLARKE, an individual, JAY A. NICHOLAS, an individual, ERIC ADLER, an individual, and MICHAEL THOMSON, an individual,<br><br>Defendants. | CASE NO.  3:23-cv-02219-AGS-MMP<br><br>**FIRST AMENDED COMPLAINT**<br><br>**1.**  Misappropriation of Trade Secrets (Defend Trade Secrets Act, 28 U.S.C. §§ 1836, *et seq*.)<br><br>**2.**  Misappropriation of Trade Secrets (Uniform Trade Secrets Act, Cal. Civ. Code § 3426 )<br><br>**3.**  Tortious Interference with Business Relations<br><br>**4.**  Intentional Interference with Prospective Economic Advantage<br><br>**5.**  Unfair Competition (Cal. Business and Prof. Code §§ 17200, *et seq*.)<br><br>**6.**  Breach of Duty of Loyalty<br><br>**7.**  Aiding and Abetting Breach of Duty of Loyalty |

Plaintiff TRIGO ADR Americas, LLC, ("TRIGO ADR" or "Plaintiff" or "Company") brings this complaint for damages, injunctive relief, and other relief set out in this Complaint against defendants OEM Logistics, LLC ("OEM"), Steve Clarke, Jay Nicholas, Michael Thomson, and Eric Adler (collectively "Defendants") and alleges as follows:

## INTRODUCTION

1.    The federal government awards major defense contracts worth billions of dollars to prime aerospace manufacturers, such as Lockheed Martin, Northrop Grumman, The Boeing Company, General Dynamics, and Raytheon Technologies. These prime aerospace manufacturers enter into subcontracts with third party suppliers that are essential to provide components and parts necessary to enable the prime aerospace manufacturer to timely fulfill its obligations under the prime contract with the government. If suppliers fail to perform under their respective subcontracts, then the entire prime contract is in jeopardy and the prime aerospace manufacturer may be in breach.

2.    TRIGO ADR partners with prime aerospace manufacturers to manage third party suppliers in order to ensure that they meet deadlines in the prime contract and ensure on-time and on-quality delivery. TRIGO ADR deploys to suppliers a team of Delivery Assurance Specialists, Supplier Development Specialists, Supplier Quality Engineers, Program and Regional Managers, and Directors. This team of TRIGO ADR employees works with suppliers to ensure product readiness, issue purchase orders, follow up on part deliveries, and report and track detailed milestone, quality management and on-site surveillance.

3.    TRIGO ADR manages suppliers with a proprietary and confidential system that categorizes suppliers into various tiers that group suppliers by the level of risk that each supplier poses to timely and fully performing its obligations under the subcontract. TRIGO ADR will assign more employees and resources to suppliers placed in the higher risk tiers. Over the years, TRIGO ADR has developed and

FORD & HARRISON LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

refined criteria that it uses to determine which suppliers should be placed into which tier. Furthermore, TRIGO ADR uses a proprietary internal intranet-based tool to determine the number of its employees needed to manage the number of suppliers the prime aerospace manufacturer is using within a certain radius.

4.      Defendants Clarke and Nicholas formerly worked as high-level executives at Supplier Management Solutions ("SMS"), which later became TRIGO ADR. While at SMS, Clarke and Nicholas regularly worked with and had full access to the proprietary system that categorizes suppliers into different tiers based on confidential criteria and the internal intranet-based tool that calculates the number of employees to assign to manage the suppliers on a particular contract.

5.      Clarke and Nicholas departed SMS in July 2021; then, in January 2023, founded a competing company, OEM Logistics, LLC ("OEM"). Since at least July 2023, Clarke and Nicholas have used TRIGO ADR's trade secrets in order to manage suppliers in OEM's contracts with prime aerospace manufacturers.

6.      Thomson and Adler worked for TRIGO ADR as Senior Director of Operations and Operations Manager, respectively, and left to work for OEM on August 16, 2023 and September 29, 2023, respectively. Before leaving TRIGO ADR, Thomson and Adler accessed, copied, and diverted TRIGO ADR's trade secrets for use at OEM. Thomson and Adler provided these trade secrets to OEM.

7.      TRIGO ADR now brings the instant action seeking damages, temporary injunctive relief, and permanent injunctive relief based on Defendants' continued possession and unlawful use of TRIGO ADR's confidential and trade secret information.

## THE PARTIES

8.      Plaintiff TRIGO ADR is a limited liability company, with its headquarters located in Carlsbad, California. The sole member of TRIGO ADR is TRIGO ADR, U.S. Inc., which is incorporated in Delaware and headquartered in Michigan. TRIGO ADR is therefore a citizen of Michigan and Delaware.

9.      Defendant OEM Logistics, LLC is a limited liability company with its headquarters located in Arizona. TRIGO ADR is informed and believes and therefore alleges that OEM is a citizen of Arizona by virtue of the citizenship of its members.

10.     TRIGO ADR is informed and believes and therefore alleges that Defendant Jay Nicholas is domiciled in Arizona and resides there with the intention to remain.  Nicholas is therefore a citizen of Arizona.

11.     Defendant Steve Clarke is domiciled in Arizona and resides there with the intention to remain.  Clarke is therefore a citizen of Arizona.

12.     Defendant Michael Thomson is domiciled in Texas and resides there with the intention to remain.  Thomson is therefore a citizen of Texas.

13.     Defendant Eric Adler is domiciled in Texas and resides there with the intention to remain.  Adler is therefore a citizen of Texas.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy is between citizens of different states and exceeds the sum or value of $75,000.

15.     This Complaint for damages and injunctive relief arises under Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*., and related common law claims. This Court has subject matter jurisdiction over the matters pleaded herein under 28 U.S.C. §§ 1331, 1367(a).

16.     All other claims for relief under various statutory and/or common laws are within the supplemental jurisdiction of this Court under 29 U.S.C. § 1367(a) because they are so related to TRIGO ADR's DTSA claim that they form part of the same case or controversy under Article III of the United States Constitution. TRIGO ADR's other claims "derive from a common nucleus of operative fact and are such that a plaintiff would ordinarily be expected to try them in one judicial proceeding." *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 855 (9th Cir. 2004). Jurisdiction is thus appropriate for all of TRIGO ADR's claims that are transactionally related to the

federal claim.

17.     OEM regularly transacts business in California, entering into contracts that are performed in California and employing individuals who reside in California.

18.     Venue is proper in this judicial district under 28 U.S.C. § 84(a) because, TRIGO ADR owns its trade secrets in and because TRIGO ADR has been damaged in this judicial district.

19.     Upon information and belief, Defendants have placed TRIGO ADR's trade secrets into the stream of commerce by marketing, targeting, and offering services to local, state, and national clients who transact business in this judicial district, and/or by knowing that products and services would be utilized into this judicial district.

## FACTUAL BACKGROUND

20.     Clarke founded SMS in 2009. Nicholas became President of SMS in July 2019. TRIGO U.S., Inc. acquired SMS in 2019 ("Acquisition"). Unless otherwise noted, TRIGO ADR also refers to SMS prior to the Acquisition.

21.     TRIGO ADR has acted as a "One stop Hub on the Quality Airway" for more than 25 years. TRIGO ADR delivers comprehensive solutions in the main aero assembly units and supplier site across Europe, Asia and America with 1,300 personnel of Expert Engineers and Quality Technicians. Due to TRIGO ADR's large-scale operational experience in Quality Management and Inspection, TRIGO ADR Aerospace Division has developed a sophisticated solution delivery platform which is always ready to address the toughest Quality challenges of the global aerospace supply chain.

22.     SMS was established in 2009 and quickly became an industry leader to many Prime Aerospace Manufacturers for third party Supplier services that support on-time delivery improvement to Commercial and Defense Production Lines. Headquartered in California, with localized offices throughout the U.S., the TRIGO ADR team of dedicated Delivery Assurance Specialists, Supplier Development

Specialists, Supplier Quality Engineers, Program and Regional Managers, and Directors are deployed to hundreds of suppliers domestically and internationally in support of increasing on-time and on-quality delivery. TRIGO ADR is capable of assuming everything from ensuring product readiness milestones, quality management and on-site surveillance of clients' supply base, as well as many other services. A combination of its proprietary CORE© System, highly skilled staff, and standard detail-driven processes makes its solution unique, and brings significant results to both clients and their End-User Customers. TRIGO ADR's approach eliminates program delays and part shortages, which adds tremendous value to its customers.

23.    TRIGO ADR works with prime aerospace manufacturers to manage their third-party suppliers to help them meet milestones and targets in a prime contract with the federal government, and ensure on-time and on-quality delivery. TRIGO ADR accomplishes this by deploying a team of employees to work with suppliers to assist them and ensure that they do indeed meet contract deadlines.

**TRIGO ADR's Trade Secrets**

24.    Since its founding and through the Acquisition, TRIGO ADR developed specific and detailed methods and procedures in its business to manage suppliers of prime aerospace manufacturers. First, TRIGO ADR vets suppliers and categorizes them into various tiers based on risk level and their reliability in meeting prime contract requirements. Suppliers vary widely in their ability to timely deliver under a prime contract both in the type and quality of product that they will provide. TRIGO ADR engages with, follows up with, and visits on-site suppliers placed in high-risk tiers much more frequently than suppliers placed in low-risk tiers.

25.    In order to place suppliers into these tiers, TRIGO ADR has applied a set of criteria, guidelines, and factors to determine how reliable the supplier is in fulfilling its obligations. This set of criteria, guidelines, and factors includes the supplier's past delivery performance, the size of the supplier, the type of products

and parts for which the supplier is responsible, the imminence of the deadlines, the anticipated length of time that the supplier will need to fulfill its contractual obligations, and how critical the supplier's on-time delivery is to the prime contract. TRIGO ADR applies this set of criteria, guidelines, and factors to each supplier working with a prime aerospace manufacturer under a prime contract.

26.    This vetting process is critical to TRIGO ADR's business and its ability to manage suppliers and assist them in meeting prime contract deadlines. This vetting process is necessary to allow TRIGO ADR to focus on and devote limited resources to the higher risk suppliers who pose the greatest threat to the prime aerospace manufacturer's ability to meet its obligations under the prime contract.

27.    In addition to the vetting process, TRIGO ADR also has developed an internal intranet-based tool, SMS Operations Management Dashboard, to conduct a "zone analysis" that mathematically calculates how many resources TRIGO ADR will use to manage all of the suppliers. If there are 100 suppliers on a particular prime contract, for example, TRIGO ADR uses the internal intranet-based tool to organize the various suppliers within geographic zones. The internal intranet-based tool determines the hub center points of each zone based on the location of the suppliers within the zone and the desired hub radius. The internal intranet-based tool then determines the number of TRIGO ADR employees needed to dispatch to the hub. This application makes these determinations based on a variety of factors, such as the number of suppliers, the size of the radius, the different tiers of the suppliers, and other factors.

28.    The internal intranet-based tool zone analysis has been used by TRIGO ADR in order to quickly assemble and dispatch a team of its employees to radius center point. Once TRIGO ADR knows the size of the team it needs, TRIGO ADR creates and publishes job postings so that it can quickly hire employees to deploy to the area. The internal intranet-based tool zone analysis is instrumental to TRIGO ADR because it tells it exactly how many employees it needs to hire and devote to

Ford & Harrison LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

**FIRST AMENDED COMPLAINT**

1    any particular prime contract.

2        29.    TRIGO ADR also maintains customer data, information, and reports

3    that are highly confidential and trade secret material. This trade secret information

4    relates both to TRIGO ADR's own business and the business of its suppliers and

5    customers. For example, TRIGO ADR has contracts with Bell Helicopter and

6    MOOG, both of which are major players in the aerospace and defense industry. The

7    following are examples of the types of trade secrets that TRIGO ADR maintains:

8        a.    <u>Supplier Lists</u>. Supplier lists contain an extensive list of suppliers

9    by state and contain total purchase order scheduled lines by supplier, supplier

10    delivery and quality performance metrics, supplier address, and a suggested

11    support code for each supplier that aligns with the TRIGO ADR surveillance

12    levels/priority (Priority 1, Priority 2, Priority 3 and Sustaining 1). These

13    support codes are critical to TRIGO ADR's business, in that they spell out the

14    resource allocation that results from TRIGO ADR's application of the

15    confidential set of criteria, guidelines, and factors to suppliers working with a

16    prime aerospace manufacturer under a prime contract.

17        b.    <u>The Customer Order Report of Execution (CORE)</u>. CORE is an

18    internal TRIGO ADR database that contains all supplier open order

19    information. Customer purchase order information is provided to the suppliers

20    and is uploaded into CORE. TRIGO ADR employees, known as Delivery

21    Assurance Specialists, use CORE to incorporate status updates that come from

22    the suppliers and Delivery Assurance Specialists also add "root cause" codes

23    created by TRIGO ADR to identify the reason that the part may be or is late.

24    After CORE updates are completed by the Delivery Assurance Specialists,

25    they are shared only with the customer and the supplier, and are strictly

26    forbidden to be shared outside of the three parties (Customer, Supplier, and

27    TRIGO ADR) involved in this process.

28    ///

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

**FIRST AMENDED COMPLAINT**

c.    <u>Customer Billing Files</u>. These files contain weekly customer billing information for customers organized by supplier and Delivery Assurance Specialist. The customer billing information is only shared with the customer through an invoice. These files include highly confidential pricing information that would allow competitors to undercut TRIGO ADR bids and to fashion a bid that copies TRIGO ADR's pricing and value of its resources.

d.    <u>Customer Website Portals and Login Credentials</u>. Customer website portals are not public domain portals and can be accessed only with login credentials assigned by the customers to access the portal and the data within it. TRIGO ADR employees' ability to access these portals with highly confidential login credentials allows an individual to view and download a variety of highly confidential third-party customer and supplier information from their portals.

e.    <u>Open Order Report (OOR)</u>. An OOR contains information related to the purchase orders submitted to customer suppliers dictating the production delivery requirements for specific material and products. This information is visible only to individuals supporting that specific supplier's delivery requirements.

f.    <u>Internal Monthly Program Reviews</u>. For each customer contract, TRIGO ADR conducts internal monthly program reviews to report on the current status of the customer contract, including financial performance. These reviews also outline any actions that may need to be taken from a customer or supplier perspective.

30.    While working for TRIGO ADR, Clarke, Nicholas, Adler, and Thomson had access to, and did access, TRIGO ADR's trade secrets regularly. TRIGO ADR's trade secrets are not known to the public and provide TRIGO ADR with a significant market advantage due to the economic value of being kept secret, and the substantial time and resources TRIGO ADR invests in the creation and improvement of these

FORD & HARRISON LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

**FIRST AMENDED COMPLAINT**

1 | secrets.

2 | **TRIGO ADR's Efforts to Keep its Trade Secrets Confidential**

3 | 31. TRIGO ADR has gone to great lengths to protect these trade secrets and

4 | keep them secret. TRIGO ADR's measures to maintain secrecy include requirements

5 | for its employees and third-party contractors to sign Proprietary Information and

6 | Invention Assignment Agreements (PIIAs), in which they agree to keep confidential

7 | TRIGO ADR's proprietary information. By way of further example, TRIGO ADR

8 | employees also agree to return all company documents and materials to TRIGO ADR

9 | at the end of their employment. TRIGO ADR's vendors, contractors, consultants, and

10 | partners sign a TRIGO ADR Confidential Information Agreement, in which they

11 | agree, among other things, to keep in confidence and trust, and not use or disclose,

12 | any TRIGO ADR trade secret to anyone outside of TRIGO ADR without the prior

13 | written consent of an authorized TRIGO ADR representative. Further, TRIGO ADR

14 | conducts background checks on its employees and any third-party contractors before

15 | granting them access to TRIGO ADR's data repositories. To prevent the inadvertent

16 | disclosure of TRIGO ADR's trade secrets in connection with collaborations with its

17 | vendors and partners, TRIGO ADR requires vendors to agree to confidentiality

18 | provisions and/or nondisclosure agreements.

19 | 32. TRIGO ADR also has departments tasked with managing user and

20 | administrative access to data and systems (devices, applications, and services) by

21 | establishing proper controls for authentication, authorization, and auditing. TRIGO

22 | ADR restricts access to certain documents on its secured repositories based upon

23 | different levels of data classification to prevent disclosure, and therefore, protect the

24 | secrecy of those documents. For access to TRIGO ADR's internal network, TRIGO

25 | ADR requires dual-factor authentication. TRIGO ADR monitors its employees'

26 | network activities, and maintains logs of, among other things, cloud uploads, USB

27 | downloads, and file transfers to and from TRIGO ADR's data repositories.

28 | ///

Ford & Harrison LLP
Attorneys At Law
Los Angeles, CA

**FIRST AMENDED COMPLAINT**

33.    TRIGO ADR physically restricts access to its offices, network, systems, and data by restricting access to its facilities to only those employees or contractors with badge access.

34.    As a condition of employment, TRIGO ADR requires its employees to sign a document acknowledging that they received, reviewed, and are bound by the Handbook provisions. The individual defendants completed such an acknowledgment.

35.    Among the various measures undertaken by TRIGO ADR to safeguard the Company's confidential information, TRIGO ADR also requires employees to sign confidentiality agreements as a condition of employment.

36.    Protection of TRIGO ADR's proprietary trade secret information is critical to TRIGO ADR's capacity to develop assets and processes, provide services, and gain economic advantages in increasingly competitive marketplaces. TRIGO ADR's trade secrets are not publicly known, nor readily ascertainable, and derive their value from being kept secret.

37.    Clarke, Nicholas, Adler, and Thomson signed Confidentiality Agreements with TRIGO ADR. The confidentiality clause in their agreements provide:

> You acknowledge that the Company continually develops Confidential Information, that you may develop Confidential Information for the Company and that you may learn of Confidential Information during the course of your employment. You will comply with the policies and procedures of the Company for protecting Confidential Information and will not disclose to any person (except as required by applicable law or for the proper performance of your duties and responsibilities to the Company), or use for your own benefit or gain, any Confidential Information obtained by you incident to your employment or other association with the Company. You understand that this restriction will continue to apply after your employment terminates, regardless of the reason for such termination.
>
> For purposes of this agreement, "**Confidential Information**" means all confidential or proprietary information, intellectual property (including trade

secrets) and confidential facts relating to or used or proposed to be used in the business, affairs or property of the Company and its affiliates, including, without limitation (i) all information which is confidential based upon its nature or the circumstances surrounding its disclosure, and (ii) any confidential information relating to the Company's and its affiliates' business policies, processes and templates, strategies, operations, finances, plans or opportunities, in each case, which was acquired by you during your employment with the Company (or during any negotiations in anticipation of such employment). You understand that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used. Confidential Information will not include information that is generally available to and known by the public at the time of disclosure to you; provided that, such disclosure is through no direct or indirect fault of you or person(s) acting on your behalf.

38.    Accordingly, Clarke, Nicholas, Thomson, and Adler owed a duty to keep TRIGO ADR's trade secrets and confidential information secret and confidential.

## Clarke, Nicholas, Thomson, And Adler  Leave TRIGO ADR And Misappropriate TRIGO ADR Trade Secrets

39.    In July 2021, Clarke and Nicholas left TRIGO ADR, and, in January 2023, founded a competing company, OEM. Just like TRIGO ADR, OEM also manages third-party suppliers on behalf of prime aerospace manufacturers.

40.    Shortly after starting OEM, Clarke and Nicholas looked to TRIGO ADR employees to take shortcuts to entering the market and to competing with TRIGO ADR. In April 2023, OEM offered a position to Thomson, who completed the OEM Logistics Healthcare Enrollment form on April 11, 2023. An Allstate Benefits employee enrollment form dated April 11, 2023 was located on Thomson's work laptop. The form lists Michael Thomson as the employee and OEM Logistics, LLC as the employer. TRIGO ADR is informed and believes, and thereon alleges, that Thomson remained employed at TRIGO ADR and provided trade secrets to OEM in breach of his duty of loyalty to TRIGO ADR. Indeed, Thomson utilized a personal

FORD & HARRISON LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

external USB storage device (Buffalo HD-PEU2 USB storage device bearing serial number 3553583454544A3120202020 ("the Buffalo drive"), which was first connected on July 12, 2022 and was used regularly on this laptop until his resignation with over one hundred connection events recorded in the system's Event Logs. There is not a legitimate business purpose at TRIGO ADR for any employee to use USB devices even minimally, and certainly not rampantly.

41.    A file named "Michael Thomson Offer Letter 8-1-23_Revised.pdf" was found in Thomson's Downloads folder in his work laptop. This letter is dated August 1, 2023 and is an offer letter from OEM. This file has a creation time stamp of 4:03 PM. Thomson formally left TRIGO ADR on August 16, 2023, to join OEM. Just before leaving, Thomson misappropriated, for the benefit of OEM, the trade secrets of TRIGO ADR on many occasions, including but not limited to the examples below. Thomson did not have a business need to access any of these files when he did.

a.    On August 1, 2023, Thomson accessed the file "Bell Supplier List 6.1.2023 - 1 of 2.zip" from an external device (D: drive) and opened it locally on Edge Explorer. This file contains an extensive Bell Supplier list by state and contains total Purchase Order Scheduled Lines by supplier, supplier delivery and quality performance metrics, supplier address, and a  suggested support code  for each supplier that aligns with the TRIGO ADR surveillance levels/priority (Priority 1, Priority 2, Priority 3 and Sustaining 1).  This specific file was authored by Julie Carter, Bell Supply Chain Project Management Principal, on June 1, 2023 and last modified by Thomson on July 18, 2023.

b.    On August 1, 2023, Thomson connected the Buffalo Drive at 6:01 pm and opened file "Bell Supplier List 6.1.2023 - 1 of 2.zip" thirteen minutes later on his work laptop from the external storage device. The WebCacheV01.dat artifacts shows that this file was accessed from a D:\ drive on August 1, 2023 at 6:14 pm. This file was accessed from the Buffalo Drive.

**FIRST AMENDED COMPLAINT**

The Buffalo Drive was the only external drive that was connected on this date.

c.     Firefox web browser history artifacts show that Thomson accessed the LMCO portal on August 15, 2023, specifically visiting "outlook.office365.us/owa/lmco.com" and "lmpassage3.external.lmco.com," which provides access to the Lockheed Outlook Web Access (OWA) portal and Lockheed Martin's intranet site, and which allowed Thomson to view his Lockheed Martin email account and various Lockheed Martin applications to support the contract with Lockheed Martin. Thomson would have no legitimate business purpose to visit either of these accounts, as he was leaving TRIGO ADR the next day. Accessing these sites allowed Thomson to view and access supplier and customer information related to the TRIGO ADR contract with Lockheed Martin, including Open Order Reports and detailed supplier performance and product delivery information. It was not a coincidence that Thomson visited this site on his last day; indeed, before that date, he had not visited the impassage site since July 18, 2023.

d.     The Buffalo Drive was connected to Thomson's work laptop on August 1, 2023 at 6:01 pm. Jump List artifacts show that, while connected, a file named "Contacts 08012023.CSV" was accessed from the drive at 6:09 pm. Thomson then attempted to delete the file.

e.     On August 1, 2023, Thomson accessed file "Contacts 08012023.CSV_Cal" from his Buffalo Drive and opened it locally on his work laptop. He then attempted to delete the file.

f.     Thomson also deleted 611 items from June 9, 2023 to July 30, 2023 from his Outlook sent folder.

42.     Adler formally left TRIGO ADR on September 29, 2023, to join OEM. System artifacts show that a USB 2.0 Flash Disk USB device bearing serial number CCBB1009161646013003100007 ("the generic USB device") was connected to Adler's work laptop. There were twenty-two connection events recorded in the

system's Event Logs and Registry associated with this device between August 15, 2023 and September 29, 2023. System artifacts show that a SanDisk U3 Cruzer Micro USB device bearing serial number 000017E48A62B89A ("the SanDisk device") was connected to Adler's work laptop on August 23, 2023. Just before leaving TRIGO ADR on September 29, 2023, Adler misappropriated, for the benefit of OEM, the trade secrets of TRIGO ADR on many occasions, including but not limited to the examples below. Adler did not have a business need to access any of these files when he did.

a.    The generic USB device was connected to Adler's work laptop on August 29, 2023. LNK file artifacts show that, while connected, a file named *MOOG.pdf* was accessed from the device. The document originated as an email, with Adler's name at the top on the right hand side on the first page, with a subject line of "MOOG Billing Draft." This file is an extract from TRIGO ADR's customer billing file and it is related to a Delivery Assurance Contract TRIGO ADR had in place with MOOG. This file contains weekly customer billing information for MOOG by Supplier and Delivery Assurance Specialists. The customer billing information is only shared with the customer through an invoice. Within the MOOG.pdf file, there are various letters and numbers, such as "US1004296," which represent invoices that were sent to MOOG for payment.

b.    The generic USB device was connected to Adler's work laptop on September 22, 2023. LNK file artifacts show that, while connected, the file "Bell Supplier List 6.1.2023 - 1 of 2.xlsx" was accessed from this device on this date. The user also accessed a folder named "Bell" from the device on this date. This file, referring to Bell Helicopter, contains an extensive Bell Supplier list by state and contains total Purchase Order Scheduled Lines by supplier, supplier delivery and quality performance metrics, supplier address, and a suggested support code for each supplier that aligns with the TRIGO ADR

FORD & HARRISON LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

**FIRST AMENDED COMPLAINT**

surveillance levels/priority (Priority 1, Priority 2, Priority 3 and Sustaining 1). This specific file was authored by Julie Carter, Bell Supply Chain Project Management Principal on June 1, 2023 and last modified by Michael Thomson on July 18, 2023.

c.      The generic USB device was connected to Adler's work laptop on September 22, 2023. LNK file artifacts show that, while connected, the file "Bell Supplier List 6.1.2023 - 2 of 2.xlsx" was accessed from the device. The user also accessed a folder named "Bell" from the device on this date. This file contains an extensive Bell Supplier list by state and contains total PO Scheduled Lines by supplier, supplier delivery and quality performance metrics, supplier address, and a  suggested support code  for each supplier that aligns with the TRIGO ADR surveillance levels / priority (Priority 1, Priority 2, Priority 3 and Sustaining 1).  This specific file was authored by Julie Carter, Bell Supply Chain Project Management Principal on June 1, 2023 and last modified by Michael Thomson on July 18, 2023. This file is very similar to the "Bell Supplier List 6.1.2023 - 1 of 2.xlsx" file, but the "Bell Supplier List 6.1.2023 - 2 of 2.xls" file contains a tab called "All Up List" which lists 820 global Bell Suppliers containing the same information listed above.

d.      Between September 15 and September 29, 2023, Adler accessed 27 Link Files that contain confidential information of TRIGO ADR and its customers. On Adler's last day alone, he accessed the following Link Files:

i.      "Automated Template." This is an automated tool created by TRIGO ADR to format the Open Order Report (OOR) extract from its internal CORE (Customer Order Report of Execution) system that contains all of the supplier data that it is supporting on behalf of its customers. The OOR extract from CORE also contains the TRIGO ADR status updates as well as the root cause codes that are impacting On-Time-Delivery (OTD) from the supplier to the customer. This data

**FIRST AMENDED COMPLAINT**

is confidential between TRIGO ADR, the customer and the supplier, and the root cause codes (and process to add to the OOR) is TRIGO ADR confidential information/data. The generic USB device was connected to Adler's work laptop on September 26, 2023. Jump List artifacts show that, while connected, a folder located on the device at the path "D:\Bell\Automated Template" was accessed.

ii.    "files (24)." Chrome download records show that a file named "files (24).zip" was downloaded from transfer.bellflight.com on September 29, 2023 at 8:45 am. This file was downloaded by Adler directly from the Bell Flight website portal that requires login credentials (UserID and Password) to access the portal, and is not a public domain website.  Access to the portal requires an application to and approval by Bell Helicopter for an individual to be issued login credentials. This specific file ("files (24).zip") that Adler downloaded directly from the Bell portal contains supplier Open Order Report (OOR) details related to the Bell Purchase Order submitted to the Bell supplier dictating the production delivery requirements for specific material and products.  The "files (24).zip" file that Adler downloaded contains OOR data for the following suppliers: RE Dye Mfg. Corp, Crestview Aerospace, LLC (taken over by OEM Logistics on or about February 12, 2024), Triumph Gear Systems, Inc, GKN Westland Aerospace, R&D Manco and TRM GAMMA Aerospace Acquisition. The "files (24).zip file" was downloaded by Adler on September 29, 2023 (his last day) at 8:45 am, he inserted his USB 2.0 Flash Disk USB Device into the TRIGO ADR work laptop on September 29, 2023 at 9:09 am, and removed the USB device on September, 29, 2023 at 9:39 am.

///

iii.    "Al Keigley 30 Day Review 6.18.2023."  Al Keigley was a Delivery Assurance Specialist who worked for TRIGO ADR until he resigned on February 26, 2024. The file itself is an annual performance review template that TRIGO ADR utilizes as part of its HR performance management process. This is confidential as it contains personal information related to the employee's performance.

iv.    "Bell Supplier List 6.1.2023 - 1 of 2."  This file is discussed extensively above.

v.    "Kaman Open Order Template."  This file is the same as the Automated Template file discussed above but specifically for Kaman, which is a different supplier.

vi.    "Bell Supplier List 6.1.2023 - 2 of 2." This file is discussed extensively above.

vii.    "Program Review."  This file is a copy of a customer program review that contains confidential TRIGO ADR financial data and customer/supplier contract data.

viii.    "SMS TRIGO BELL Program Review August 2023." TRIGO ADR conducts internal monthly "program" reviews for each customer contract that it has in place, including with Bell Helicopter.  The intent is to review the current status of the customer contract, including financial performance, and discuss any actions that may need to be taken from a customer or supplier perspective. Chrome download records on Adler's work laptop show that a file named "SMS TRIGO BELL Program Review August 2023 - Copy.pptx" was downloaded from usc-powerpoint.officeapps.live.com on September 18, 2023. The August review was conducted on September 22, 2023 and Adler participated in the call. All program review presentations are maintained on Teams in an individual folder specifically for each

18

customer and the relevant TRIGO ADR employees supporting that specific customer contract is provided access to that Teams folder. Editing of the presentations is normally performed within Teams and a download from the Teams folder is not required. Adler was the last person to access this file on Teams on September 22, 2023. The program review PowerPoint presentation contains Account Overview, Account Activity (including contract financials), Supplier Portfolio and then open discussion. This contains confidential finance and supplier performance data.

  ix. <u>"SMS TRIGO MOOG Program Review JULY 2023."</u> This file is a program review for MOOG.

  e. On September 29, 2023, eleven email messages were sent from Adler's TRIGO email to a personal address (eaaircraft@gmail.com) between 9:14 am and 9:47 am. The message sent at 9:47 am contains a URL to the Textron login portal. Textron is Bell Helicopter's parent company. The message sent at 9:15 am contains screenshots that reference Norris Precision Manufacturing. The message sent at 9:14 am contain the contents of the TRIGO ADR Operations Manager job description. The Bell Textron website portals are not public domain portals and must be assigned login credentials by Bell to access the portal and the data within it.  The access from the TRIGO ADR employees is through the TRIGO ADR work laptop using the portal link login landing page.

  f. Chrome browser history on Adler's Work laptop shows that multiple Bell/Textron portals websites were accessed on September 29, 2023 between 8:44 am and 8:49 am: bellscorecard.txt.textron.com, login.textron.com, transfer.bellflight.com, sell2bell.textron.com.

  g. Adler accessed the following websites and downloaded the files listed:

**FIRST AMENDED COMPLAINT**

FORD & HARRISON LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

i.    September 29, 2023 (Adler's last day): transfer.bellflight.com (website): "files (24).zip." This file was downloaded directly from the Bell Flight website portal that requires login credentials (UserID and Password) to access the portal; this is not a public domain website. Access to the portal requires an application to and approval by Bell for an individual to be issued login credentials. This specific file ("files (24).zip") that Adler downloaded directly from the Bell portal contains supplier Open Order Report (OOR) details related to the Bell Purchase Order submitted to the Bell supplier dictating the production delivery requirements for specific material and products. Access to this information is limited and is visible only to individuals supporting that specific supplier's delivery requirements (*i.e,*. Bell, TRIGO ADR and supplier).  The "files (24).zip" file that Adler downloaded contains OOR data for the following suppliers: RE Dye Mfg. Corp, Crestview Aerospace, LLC (taken over by OEM Logistics on or about February 12, 2024), Triumph Gear Systems, Inc, GKN Westland Aerospace, R&D Manco and TRM GAMMA Aerospace Acquisition.

The files (24).zip file was downloaded by Adler on September 29, 2023 (his last day) at 8:45 am and he inserted his USB 2.0 Flash Disk USB Device into the TRIGO ADR work laptop on September 29, 2023 at 9:09 am and removed the USB device on September, 29, 2023 at 9:39 am.

ii.    September 28, 2023: www.smscoresystem.com (website): "DAS_ Parts_Status_Update (4).xls." Chrome download records on Adler's work laptop show that a file named "DAS_Parts_Status_Update (4).xls" was downloaded from smscoresystem.com on September 28, 2023. This file is from the TRIGO ADR Customer Order Report of

Ford & Harrison LLP
Attorneys At Law
Los Angeles, CA

**FIRST AMENDED COMPLAINT**

Execution (CORE) and contains the Bell supplier open order report details (Customer Purchase Order information that is provided to the suppliers is uploaded into CORE).  CORE is an internal TRIGO ADR database that contains all supplier open order information and the TRIGO ADR Delivery Assurance Specialists (DAS) use the CORE system to incorporate status updates that comes from the suppliers and the DAS also adds "root cause" codes to identify the reason that the part may be or is late. These root cause codes were created by TRIGO ADR. After the CORE updates are completed by the DAS, they are shared only with the customer and the supplier, and is strictly forbidden to be shared outside of the three parties (Customer, Supplier, and TRIGO ADR) involved in this process. The file "DAS_Parts_Status_Update (4)" that was downloaded from CORE on September 28, 2023 contains the open order report data for Crestview Aerospace, LLC a supplier of Bell located in Crestview, Florida that was covered by a TRIGO ADR Delivery Assurance Specialist until February 9, 2024 at which time OEM Logistics took over support of Crestview Aerospace on behalf of Bell and hired the TRIGO ADR Delivery Assurance Specialist (Brad Smith) away from TRIGO ADR.

iii.      September 25, 2023: transfer.bellflight.com (website): "files (23).zip." Chrome download records show that a file named "files (23).zip" was downloaded from transfer.bellflight.com on September 25, 2023. This file contains the Bell OOR data for  the same suppliers listed above that are contained in the "files (24).zip" file that was downloaded by Adler on September 29, 2024.

iv.      September 18, 2023: usc-powerpoint.officeapps (website): "SMS TRIGO Bell Program Review August 2023 - Copy.pptx." This is an internal monthly "program" review. The August review was

FORD & HARRISON LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

conducted on September 22, 2023 and Adler participated in the call. The program review PowerPoint presentation contains Account Overview, Account Activity (including contract financials), Supplier Portfolio and then open discussion.

v.       September 18, 2023: transfer.bellflight.com – "files (22).zip." Chrome download records on Adler's work laptop show that a file named "files (22).zip" was downloaded from transfer.bellflight.com on this date. This file contains the Bell OOR data for the same suppliers listed above with the exception of RE Dye Mfg. Corp that are contained in the "files (23).zip" downloaded on September 25, 2023 and in the "files (24).zip " downloaded on September 29, 2023.

43.    After Thomson and Adler left TRIGO ADR with TRIGO ADR's trade secrets, OEM immediately used these trade secrets in competition with TRIGO ADR. Specifically, OEM used the trade secrets outlined above to solicit the business of various suppliers and customers, including Bell Helicopter, MOOG, and Crestview Aerospace.

44.    Since at least July 2023, Defendants have used TRIGO ADR's trade secrets in order to manage suppliers in OEM's contracts with prime aerospace manufacturers. Defendants have used and continue to use TRIGO ADR's vetting system, applying the same set of confidential criteria, guidelines, and factors to determine how reliable the supplier is in fulfilling its obligations. Defendants utilize TRIGO ADR's trade secrets to classify suppliers into the same set of tiers Clarke, Nicholas, Adler, and Thomson previously used at TRIGO ADR. Indeed, Defendants openly boast of this misappropriation on OEM's website, confessing that they use a "customized, three-level supplier surveillance model" which "leverages 'boots on the ground' to effectively manage suppliers and sub-tiers based on their current performance dynamics."

///

45.    Since at least July 2023, Defendants have used TRIGO ADR's proprietary vetting process, its confidential set of criteria, guidelines, and factors to place suppliers in various tiers based on risk level, and its internal intranet-based tool zone analysis.

46.    Defendants' use of TRIGO ADR's trade secrets can be inferred based on (1) Clarke's, Nicholas's, Thomson's, and Adler's access to TRIGO ADR's trade secrets, (2) OEM's hiring of TRIGO ADR employees with access to these trade secrets, (3) Adler's and Thomson's downloading of trade secret files just before leaving that they had no business need for, (4) Adler's and Thomson's rampant use of USB devices, particularly in their final days and just after opening trade secret files, (5) OEM's accelerated timeline that allowed it to mimic TRIGO ADR's business model and provide identical services in faster time than if it had not used TRIGO ADR's trade secrets, and (6) the similarity of OEM's and TRIGO ADR's products and services.

47.    Defendants' use of TRIGO ADR's trade secrets has given them an unfair advantage in the marketplace and they have used these trade secrets to market their services and enter into contracts with prime aerospace manufacturers. OEM has taken business opportunities away from TRIGO ADR by misappropriating TRIGO ADR's trade secrets.

48.    Defendants' repeated and intentional acts of misappropriating TRIGO ADR's trade secrets constitute willful and malicious conduct.

49.    Defendants have used TRIGO ADR's trade secrets to damage TRIGO ADR's existing and prospective business relationships with its clients, and to gain competitive advantage over TRIGO ADR as a direct competitor. In doing so, Defendants knowingly and maliciously misappropriated TRIGO ADR's trade secrets and sought unfair competitive advantage against TRIGO ADR.

///

///

# FIRST CAUSE OF ACTION

**(Trade Secret Misappropriation in Violation of the Defend Trade Secrets Act – 18 U.S.C. §§ 1836,** *et seq.***)**

**(Against all Defendants)**

50.    TRIGO ADR incorporates and restates the allegations in Paragraphs 1-49 as if fully set forth herein.

51.    TRIGO ADR's trade secrets are not generally known nor readily ascertainable, and derive value by virtue of being kept secret.

52.    TRIGO ADR has taken reasonable steps to protect its trade secrets from discovery or third-party disclosure.

53.    TRIGO ADR has invested substantial time, skill and financial resources into the creation and maintenance of TRIGO ADR's trade secrets.

54.    TRIGO ADR is the owner of the trade secrets described in this Complaint.

55.    TRIGO ADR's trade secrets relate to products or services that are used in, or intended for use in, interstate or foreign commerce.

56.    Defendants willfully and maliciously took and used TRIGO ADR's trade secrets in their competition with TRIGO ADR, without authorization.

57.    TRIGO ADR incurred significant damage related to Defendants' misappropriation.  In addition, because TRIGO ADR's remedies at law are not sufficient to fully protect its continuing interest in preserving the trade secrets against future infringements by Defendants and those with whom or which they are in active concert, TRIGO ADR is entitled to an injunction against the future use of the trade secrets by Defendants and those with whom or which they are in active concert. TRIGO ADR is also entitled to an injunction prohibiting any other improper use or disclosure by Defendants.

58.    Furthermore, Defendants acts herein constitute willful and malicious misappropriation of TRIGO ADR's trade secrets, entitling TRIGO ADR to enhanced

FORD & HARRISON LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

**FIRST AMENDED COMPLAINT**

damages, including but not limited to, exemplary damages, punitive damages, and reasonable attorneys' fees under 18 USC § 1836(b)(3).

## SECOND CAUSE OF ACTION

### (Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426)

### (Against all Defendants)

59.    TRIGO ADR incorporates and restates the allegations in Paragraphs 1-49 as if fully set forth herein.

60.    Defendants' misappropriation of trade secrets is independently actionable under California's Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 et seq.

61.    Defendant's misappropriation of TRIGO ADR's trade secret information was willful and malicious.

62.    If Defendants are not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit and the benefit of others and to TRIGO ADR's detriment TRIGO ADR's trade secret information.

63.    Because TRIGO ADR's remedy at law is inadequate, TRIGO ADR seeks preliminary and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and other legitimate business interests. Injunctive relief is necessary to eliminate the commercial advantage that otherwise would be derived from Defendants' continued misappropriation of TRIGO ADR's trade secret information. TRIGO ADR is entitled to injunctive relief under Cal. Civ. Code § 3426.2.

## THIRD CAUSE OF ACTION

### (Tortious Interference with Business Relations)

### (Against all Defendants)

64.    TRIGO ADR incorporates and restates the allegations in Paragraphs 1-49 as if fully set forth herein.

///

65.    TRIGO ADR has existing contracts and business relationships with its customers that Defendants know about and have targeted for solicitation.

66.    Defendants acted with a conscious and intentional desire to interfere with these contracts and business relationships in an effort to disrupt TRIGO ADR's ongoing business relationships with its customers.

67.    TRIGO ADR's contractual and business relationships were substantially disrupted by the intentional efforts of Defendants.

68.    Even if some of the misappropriated material discussed above does not rise to the level of trade secret, proprietary, and confidential information, then Defendants' theft and use of this material is independently actionable as it constitutes a tortious interference with TRIGO ADR's business relations.

69.    TRIGO ADR has been and will continue to be damaged as a result of Defendants' intentional and malicious conduct.

## **FOURTH CAUSE OF ACTION**

### **(Interference with Prospective Economic Advantage)**

### **(Against all Defendants)**

70.    TRIGO ADR incorporates and restates the allegations in Paragraphs 1-49 as if fully set forth herein.

71.    Defendants interfered with TRIGO ADR's prospective business relationships with TRIGO ADR's clients and partners by their independently tortious and unlawful acts.

72.    Ongoing and prospective business relationships were prevented from occurring by the independently unlawful acts of Defendants.

73.    Defendants acted with a conscious desire to interfere with TRIGO ADR's prospective business relationships with its partners and clients, or knew that TRIGO ADR's prospective relationships with such partners and clients was certain or substantially certain to be impacted as a result of Defendants' unauthorized conduct.

Ford & Harrison LLP
Attorneys At Law
Los Angeles, CA

**FIRST AMENDED COMPLAINT**

74.     Even if some of the misappropriated material discussed above does not rise to the level of trade secret, proprietary, and confidential information, then Defendants' theft and use of this material is independently actionable as it constitutes an interference with TRIGO ADR's business relations.

75.     TRIGO ADR has been and will continue to be damaged as a result of TRIGO ADR's prospective economic advantage.

76.     TRIGO ADR has suffered and will continue to suffer irreparable injury, and its remedy at law is by itself inadequate to compensate it for the injuries inflicted by Defendants.

## **FIFTH CAUSE OF ACTION**

**(Unfair Competition – Violation of California Bus. & Prof. Code §§ 17200,** *et seq.***)**

**(Against all Defendants)**

77.     TRIGO ADR incorporates and restates the allegations in Paragraphs 1-49 as if fully set forth herein.

78.     Defendants engaged in unfair, unlawful, fraudulent, and deceptive business practices in direct violation of California Business & Professions Code section 17200, *et seq.* ("UCL"), by willfully and maliciously stealing TRIGO ADR's trade secrets.

79.     Defendants' misappropriation of TRIGO ADR's trade secrets gained them an unfair competitive advantage at TRIGO ADR's expense.

80.     Even if some of the misappropriated material discussed above does not rise to the level of trade secret, proprietary, and confidential information, then Defendants' theft and use of this material is independently actionable as it constitutes unfair competition.

81.     TRIGO ADR is entitled to restitution and injunctive relief resulting from Defendants' misappropriation, including but not limited to, restoration of money and property that was obtained through Defendants' unfair competition.

### SIXTH CAUSE OF ACTION

**(Breach of Duty of Loyalty)**

**(Against Thomson and Adler)**

82.    TRIGO ADR incorporates and restates the allegations in Paragraphs 1-49 as if fully set forth herein.

83.    As an employee of TRIGO ADR, Thomson and Adler owed TRIGO ADR a duty of undivided loyalty that required Thomson and Adler to act in TRIGO ADR's interests.  TRIGO ADR relied on Thomson and Adler's loyalty and integrity and their faithful performance of their duties and responsibilities.

84.    During Thomson and Adler's employment with TRIGO ADR, Thomson and Adler knowingly acted against TRIGO ADR's interests by including but not limited to, working directly for TRIGO ADR's competitors while concurrently employed with TRIGO ADR, providing TRIGO ADR's competitors with internal and confidential trade secret business data that undermined TRIGO ADR's profitability and relationships with customers, and misappropriating TRIGO ADR's trade secrets for the purpose of competing with TRIGO ADR.

85.    As a direct and proximate result of Thomson and Adler's conduct, TRIGO ADR suffered losses that it would not have otherwise suffered had Thomson and Adler not acted in the manner as described above, in an amount to be proven at the time of trial.

86.    Thomson and Adler engaged in the conduct alleged herein knowingly, intentionally, willfully, and maliciously, with the intent to harm TRIGO ADR's lawful business, and with willful and reckless disregard for the consequences.  As a result of such outrageous conduct, TRIGO ADR seeks exemplary and punitive damages against Thomson and Adler.

87.    As a proximate and direct result of Thomson and Adler's disloyalty, TRIGO ADR has suffered and will continue to suffer monetary and other damage to its revenue, reputation, goodwill, and livelihood, the exact amount to be determined

28

FORD & HARRISON LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

1  at trial.

2  <u>**SEVENTH CAUSE OF ACTION**</u>

3  **(Aiding and Abetting Breach of Duty of Loyalty)**

4  **(Against OEM, Clarke, and Nicholas)**

5  88.    TRIGO ADR incorporates and restates the allegations in Paragraphs

6  1-49 as if fully set forth herein.

7  89.    OEM, Clarke, and Nicholas actively participated in Thomson's and

8  Adler's breach of their duty of loyalty by aiding, abetting, and instructing Thomson

9  and Adler to secretly assist OEM, Clarke, and Nicholas with their efforts to compete

10  with TRIGO ADR while they were still working for TRIGO ADR, divulge TRIGO

11  ADR's trade secrets and other confidential information to OEM, Clarke, and

12  Nicholas, and conspire with and become employed by OEM while still employed by

13  TRIGO ADR.

14  90.    OEM, Clarke, and Nicholas participated in Thomson's and Adler's

15  breach of duty of loyalty for the purpose of advancing their own interests.

16  <u>**PRAYER FOR RELIEF**</u>

17  WHEREFORE, for those reasons set forth herein, TRIGO ADR respectfully

18  requests that this Court enters judgement as follows:

19  1.    For compensatory, exemplary, and punitive damages, plus pre-

20  judgment and post-judgment interest thereon at the maximum legal rate, according

21  to proof.

22  2.    For costs, expenses, and reasonable attorneys' fees incurred in this

23  action and pursuant to 18 U.S.C. § 1836.

24  3.    For an injunction against Defendants, compelling them to return and

25  delete TRIGO ADR's information and all other information generated therefrom;

26  compelling them to submit to a forensic inspection to ensure deletion and to uncover

27  the extent of Defendants' misappropriation of its trade secrets; and enjoining them

28  from using any of TRIGO ADR's confidential information, including its trade

Ford & Harrison LLP
Attorneys At Law
Los Angeles, CA

**FIRST AMENDED COMPLAINT**

1    secrets, indefinitely.

2        4.    For such other and further relief as the Court deems just and proper.

3                    **<u>DEMAND FOR JURY TRIAL</u>**

4        Pursuant to Federal Rule of Civil Procedure 38, Plaintiff TRIGO ADR

5    demands a jury trial on all issues so triable.

6

7    Dated: March 1, 2024              **FORD & HARRISON LLP**

8

9                        By: */s/ Daniel Chammas*

10                            Daniel B. Chammas
                             Jason Shon
11                           Attorneys for Plaintiff
                             TRIGO ADR AMERICAS, LLC
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>PROOF OF SERVICE</u>

I, Lillian Marquez, declare:

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 350 South Grand Avenue, Suite 2300, Los Angeles, California 90071.

On **March 1, 2024**, I served a copy of the following document(s) described below on the interested parties in this action, as follows:

### **FIRST AMENDED COMPLAINT**

John C. Hueston, Esq.    Attorneys for Defendants,
Yegor Fursevich, Esq.     OEM Logistics, LLC,
HUESTON HENNIGAN LLP  Steven M. Clarke, and Jay
620 Newport Center Drive, Suite 1300 A. Nicholas
Newport Beach, CA 92660
Tel.: (949) 229-8640
Fax: (949) 775-0898
Email: jhueston@hueston.com
   yfursevich@hueston.com

☒ **ELECTRONICALLY:** I caused a true and correct copy thereof to be electronically filed using the Court's Electronic Court Filing ("ECF") System and service was completed by electronic means by transmittal of a Notice of Electronic Filing on the registered participants of the ECF System.

☐ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I electronically served the documents on the date shown below to the e-mail addresses of the person listed above. I did not receive within a reasonable time after the transmission any electronic message or other indication that the transmission was unsuccessful.

☒ **FEDERAL:** I declare that I am employed in the office of a member of the State Bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America and State of California that the above is true and correct.

Executed on **March 1, 2024**, at Los Angeles, California.

_____
Lillian Marquez

**PROOF OF SERVICE**